UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LORETTA STREICHERT,

                              Plaintiff,

            -against-

TOWN OF CHESTER, NEW YORK, *et al.*,

                              Defendants.

19-CV-7133 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Michael H. Sussman, Esq.
Sussman & Associates
Goshen, NY
*Counsel for Plaintiff*

Cristina A. Knorr, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Loretta Streichert ("Plaintiff") brings this Action under 42 U.S.C. § 1983,

alleging that the Town of Chester (the "Town"), former Town Supervisor Alex Jamieson, Town

Supervisor Robert Valentine, and Town Board Members Cynthia Smith and Ryan C. Wensley

(collectively, "Defendants") committed intentional gender discrimination in violation of the

Equal Protection clause of the Fourteenth Amendment.  (Compl. ¶¶ 44–45 (Dkt. No. 1).)[1]

---

[1] The Town of Chester is a municipal corporation situated in Orange County, New York.
(Compl. ¶ 3.)  The Town is governed by a five-member Town Board.  (*Id.* ¶ 8.)  The Town
Supervisor serves as the chief administrative officer for the Town and "convenes and runs" the
Town Board's meetings.  (*Id.* ¶ 9.)  Prior to becoming Town Supervisor in November 2018,
Defendant Robert Valentine "served as a Town Board member at all times relevant" to the
instant dispute, as did Defendants Smith and Wensley.  (*Id.* ¶¶ 5–6.)

Before the Court is Defendants' Motion To Disqualify Plaintiff's Counsel, Michael H. Sussman. (*See* Not. of Mot. (Dkt. No. 31).)  For the reasons discussed herein, the Motion is denied.

## I.  Background

### A.  Factual History

Defendants' Motion stems from a gender discrimination lawsuit brought on July 31, 2019.  (*See* Dkt. No. 1.)  The Court will summarize the underlying Action only as necessary to decide the instant Motion.

#### 1.  The Underlying Gender Discrimination Lawsuit

In the underlying lawsuit, Plaintiff brings two causes of action for gender discrimination in violation of the Equal Protection clause of the Fourteenth Amendment, as made actionable against Defendants by 42 U.S.C. § 1983.  (*See* Compl. ¶¶ 44–45.)  Each cause of action is predicated on Defendants' treatment of Plaintiff as compared to their treatment of Plaintiff's former male colleague, Walter Popailo ("Popailo").  (*See id.*)

Plaintiff's first cause of action is based on her and Popailo's allegedly comparable employment for the Town of Chester.  Specifically, Plaintiff alleges that Defendants, who made hiring and compensation decisions for the Town, (*id.* ¶ 11), failed "to properly title, compensate[,] and employ" her in comparison to Popailo, despite the fact that she and Popailo held similar roles and responsibilities, (*id.* ¶ 44).

In June 2014, the Town Board appointed Popailo to the part-time position of "Parks and Recreation Director."  (*Id.* ¶ 13.)  In July 2014, the Town Board voted to make Plaintiff the Town's full-time "recreation coordinator."  (*Id.* ¶ 14.)  Six months later, Plaintiff alleges, the Town Board was paying Popailo an annual salary of $36,235.60, while only paying her an hourly

wage of $23.99.  (*Id.* ¶¶ 16–17.)  Plaintiff also alleges that the Town Board "did not list her as having any title" at this time.  (*Id.* ¶ 17.)[2]

In June 2015, the Town Board made Popailo's position a full-time role, (*id.* ¶ 18), and, in January 2016, confirmed that Popailo would serve as full-time "Director of Parks and Recreation" with an annual salary of $55,000, (*id.* ¶ 19); meanwhile, however, the Town Board listed Plaintiff merely as "Park & Recreation Streichert," with an hourly wage of $28.66 per hour, (*id.* ¶ 21).[3]  Plaintiff notes that although Popailo had been appointed to a full-time position, he had not yet taken a civil service examination, and thus, his appointment was made on a "provisional" basis.  (*Id.* ¶¶ 18, 20.)  Plaintiff and Popailo would both take the civil service examination for the "recreation director" title in October 2016, with Plaintiff earning a higher score.  (*Id.* ¶¶ 22–23.)

In April 2017, the Town Board terminated Popailo in the wake of reports that he had made certain comments—"allegedly captured on video"—that were "embarrassing" to the Town.

---

[2] Although the Complaint also alleges that Plaintiff "was receiving pay of 85%" around this time, (Compl. ¶ 17), it is not clear what the denominator in this percentage is.  The allegation could be that Plaintiff was receiving 85 percent of the hourly wage typically associated with a full-time position, (*cf. id.* ¶ 15 (alleging that in her position as full-time recreation director, Plaintiff "received 80% of the hourly salary associated with a full-time position"))—an assertion that, while troubling, does not appear relevant to Plaintiff's argument that she was not properly compensated "as compared to her similarly-situated" male colleague, Popailo, (*see id.* ¶ 44).  Alternatively, the allegation could be that Plaintiff "was receiving . . . 85%" of what Popailo himself was being paid.  However, Plaintiff's hourly rate of $23.99 would have generated approximately $49,900 in annual pay for a full-time employee ($23.99/hour x 40 hours per week x 52 weeks per year = $49,899.20), which exceeds Popailo's annual salary at this time, (*see id.* ¶ 16).

[3] The Complaint also notes that Plaintiff's hourly wage—$28.66 per hour—was less than the wage paid to every male employee in the "Highway Department," and "one which is not at 100% hourly wage, but 95% of a clerk's wage."  (Compl. ¶ 21.)  It is unclear how these allegations bear on Plaintiff's theory that she was mistreated as compared to Popailo specifically.  (*See id.* ¶ 44.)

(*Id.* ¶ 24.)  Plaintiff avers that after Popailo's departure, Defendants "all agreed" in August 2017 that Plaintiff would serve as "head" of the Town's Recreation Department, (*id.* ¶¶ 25–26), while another individual, then serving as the Town's Grounds and Maintenance Supervisor, would lead the Parks Department, (*id.* ¶ 25).  But despite her agreed-upon role as head of the Recreation Department, Plaintiff alleges that Defendants never provided her with the title or salary that Popailo had received "in the same position."  (*Id.* ¶ 26.)  Likewise, when the Town Board adopted its 2018 budget in November 2017, Plaintiff received a three percent salary increase—raising her pay to $32 an hour—but did not receive Popailo's salary, even though she allegedly had been "appointed to replace [him]."  (*Id.* ¶ 29.)  Nor did Plaintiff receive the official title of "Director" until August 2018, after she had been given additional responsibility for managing the Town's new senior center.  (*Id.* ¶ 31.)  Accordingly, the crux of Plaintiff's first cause of action is that, while "assign[ing] [her] the same duties and responsibilities [as] her male predecessor [Popailo]," Defendants did not provide her with the same salaried position Popailo had received, and only belatedly gave her the title of "Director."  (*Id.* ¶ 32.)[4]

Plaintiff's second cause of action is based on Defendants' 2019 decision to hire Popailo, instead of her, as "Recreation Director" for the Sugar Loaf Performing Arts Center (the "Sugar Loaf Position").  (*See id.* ¶¶ 33, 45.)  Plaintiff alleges that she possessed "superior qualifications" for this position and, unlike Popailo, who had been terminated just two years earlier, had an

---

[4] It is clear on the face of the Complaint that Plaintiff and Popailo's positions were nominally *not* the same: Whereas Popailo served as Director of both Recreation *and* Parks, (*see* Compl. ¶¶ 13, 16, 19), the Town Board, by Plaintiff's own admission, deliberately bifurcated these roles in August 2017, placing her in charge of Recreation and placing Patrick Taggart in charge of Parks, (*id.* ¶ 25).  Plaintiff's argument, therefore, must be that the positions in which she and Popailo served were *functionally* the same.  (*See id.* ¶ 26 (characterizing Plaintiff's role as "the same position" in which Popailo had served); *id.* ¶ 29 (alleging that Plaintiff "had been appointed to replace Popailo"); *id.* ¶ 32 (alleging that Defendants assigned Plaintiff "the same duties and responsibilities" as Popailo).)

"unsullied employment record." (*Id.* ¶ 41.)  Plaintiff also alleges that Defendants mislabeled the

Sugar Loaf Position as "Recreation Director," even though its appropriate civil service

classification would have been "Arts and Civic Center Manager." (*Id.* ¶ 38.)  Because Popailo

would have lacked the necessary qualifications for the latter designation, Plaintiff avers,

Defendants "intentionally misclassified the position" so that Popailo could secure the job. (*Id.*

¶¶ 38–39.)

Plaintiff alleges that Defendants' actions caused her monetary damages, as well as non-

monetary damages "including humiliation and embarrassment." (*Id.* ¶ 42.)

### 2.  Defendants' Motion To Disqualify Plaintiff's Counsel

By letter dated June 12, 2020, Defendants notified the Court that shortly after Popailo

was terminated by the Town in April 2017, he met with Michael Sussman ("Sussman"), the

lawyer now representing Plaintiff in the instant Action, to discuss "a potential lawsuit against the

Town as a result" of his termination. (*See* Letter from Cristina A. Knorr, Esq., to Court (June 12,

2020) ("June 12 Knorr Letter") 1 (Dkt. No. 28).)  Although Sussman ultimately declined to take

Popailo's case, Defendants point out that Plaintiff now relies on Popailo's termination "to

establish her claims against [] [D]efendants[,]" and "[P]laintiff's claims rest on her comparison

to Mr. Popailo." (*Id.*)  Relying principally on Rule 1.18 of the New York Rules of Professional

Conduct, which governs an attorney's obligations to prospective clients, Defendants argue that

Sussman has a conflict of interest and must be disqualified. (*See id.* at 1–3.)[5]  The crux of

---

[5] Rule 1.18 provides in relevant part that "[e]ven when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client." N.Y. R. Prof'l Conduct 1.18(b).  Moreover, a lawyer subject to this limitation "shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter."  N.Y. R. Prof'l Conduct 1.18(c).

Defendants' theory is that by consulting with Popailo, a prospective client, Sussman obtained confidential and potentially harmful information that he can now use against Defendants. (*See id.* at 3 (arguing that "[t]he facts of [Popailo's] termination, as well as [his] employment history with the Town, are facts and information that are not only potentially relevant to this matter but are being relied upon by [] [P]laintiff to establish her claims"); *see also* Defs.' Mem. of Law in Supp. of Mot. To Disqualify Counsel ("Defs.' Mem.") 5 (Dkt. No. 31-2) (arguing that "Mr. Popailo should certainly not be cross-examined or questioned on issues and facts that he discussed with Mr. Sussman during a confidential consultation").) Indeed, Popailo submitted an affidavit in support of Defendants' Motion alleging that he had provided Sussman with confidential information that could "be relevant to [] [P]laintiff's action." (Aff. of Walter Popailo in Supp. of Defs.' Mot. To Disqualify Counsel ("Popailo Aff.") ¶ 2 (Dkt. No. 31-5).) In a supplemental filing requested by the Court, (*see* Order Requesting Suppl. Affs. ("Order") 7–8 (Dkt. No. 35)), Popailo elaborated on the nature of this information, which allegedly involved the circumstances surrounding his 2017 termination, (*see* Sealed Suppl. Aff. of Walter Popailo in Further Supp. of Defs.' Mot. To Disqualify Counsel ("Popailo Sealed Aff.") ¶¶ 3–5 (Dkt. No. 38)). Defendants also argue that Sussman should be disqualified under the advocate-witness rule, alleging that his conversations with Popailo "are both in dispute and material to the claims being litigated." (*See* Defs.' Mem. 7.)

Sussman acknowledges that Popailo came to him as a prospective client following his termination as Director of Parks and Recreation. (*See* Letter from Michael H. Sussman, Esq., to Court (June 18, 2020) ("June 18 Sussman Letter") 1–2 (Dkt. No. 29).) Specifically, he and Popailo "exchanged several emails" and met at Sussman's home on May 13, 2017. (*Id.* at 2.) But although Sussman concedes that Popailo was a prospective client of his, (*see id.* at 4), he

vigorously denies having received any confidential information that would require his

disqualification in the instant case, (*see, e.g.*, *id.* at 3), a denial he reiterated in a supplemental

filing requested by the Court, (*see* Suppl. Decl. of Michael H. Sussman, Esq., in Further Supp. of

Opp'n to Defs.' Mot. To Disqualify Counsel ("Suppl. Sussman Decl.") ¶ 4(c) (Dkt. No. 36)).

    B.  Procedural History

Plaintiff filed her Complaint on July 31, 2019, (*see* Dkt. No. 1), Defendants filed their

Answer on September 23, 2019, (*see* Dkt. No. 23), and, four days later, the case was

automatically referred to the Southern District of New York's Alternative Dispute Resolution

program, (*see* Dkt. No. 24).  Two weeks after a failed mediation conference, (*see* Dkt. (minute

entries for May 8, 2020); Dkt. No. 27), Defendants filed their letter seeking leave to disqualify

Sussman, (*see* Dkt. No. 28).  Sussman responded by letter dated June 18, 2020.  (*See* Dkt. No.

29.)  After the Court allowed Defendants to proceed with their proposed motion, (*see* Dkt. No.

30), Defendants filed their Motion To Disqualify Counsel and related papers on July 17, 2020,

(*see* Dkt. No. 31).  Plaintiff filed an Opposition and supporting papers on August 17, 2020.  (*See*

Pl.'s Mem. of Law in Opp'n to Defs.' Mot. To Disqualify Counsel ("Pl.'s Mem.") (Dkt. No. 32);

Decl. of Michael H. Sussman, Esq., in Supp. of Opp'n to Defs.' Mot. To Disqualify Counsel

("Sussman Decl.") (Dkt. No. 33).)  Defendants filed their Reply on September 9, 2020.  (*See*

Defs.' Reply Mem. of Law in Further Supp. of Mot. To Disqualify ("Defs.' Reply") (Dkt. No.

34).)  After reviewing the Parties' submissions, the Court concluded that the instant Motion

"rests on contested issues of fact," including "whether Popailo disclosed *any* confidential

information to Sussman over the course of their preliminary consultation" and, if so, "whether

such information could be 'significantly harmful' to Popailo so as to trigger" the protections of

Rule 1.18(c).  (Order 5–6.)  Accordingly, the Court ordered Popailo to file a supplemental

affidavit "identifying any confidential information he disclosed to Michael Sussman, along with any information that could be significantly harmful to him in the instant matter." (*Id.* at 7.)  The Court also invited Sussman to file an affidavit "supplementing the information he ha[d] already provided to the Court." (*Id.* at 8.)  Popailo and Sussman were also directed to provide any emails or contemporaneous notes regarding their 2017 consultation, and both were directed to file their supplemental affidavits and corresponding documentation under seal, along with redacted versions for public docketing. (*See id.* at 7.)  On October 19, 2020, Sussman filed sealed and redacted versions of his supplemental submissions, which also attached copies of his email correspondence with Popailo in May 2017. (*See* Dkt. Nos. 36–37.)  Popailo filed his supplemental submission under seal on October 27, 2020, but did not provide a redacted version. (*See* Dkt. No. 38.)

## II.  Discussion

### A.  Standard of Review

The authority to disqualify an attorney stems from federal courts' "inherent power to 'preserve the integrity of the adversary process.'" *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Bd. of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  When presented with a disqualification motion, courts in the Second Circuit have been instructed to take a "restrained approach that focuses primarily on preserving the integrity of the trial process." *Papyrus Tech. Corp. v. N.Y. Stock Exch., Inc.*, 325 F. Supp. 2d 270, 276 (S.D.N.Y. 2004) (citation omitted).  The Court's role, therefore, is not to police each and every violation of professional rules, but rather to ensure that the proceeding before it is free from taint.  *See Jose Luis Pelaez, Inc. v. McGraw-Hill Glob. Educ. Holdings LLC*, 366 F. Supp. 3d 567, 571 (S.D.N.Y. 2019) (noting that, "[i]n this Circuit, disqualification is called for only

where an attorney's conduct tends to taint the underlying trial, because federal and state disciplinary mechanisms suffice for other ethical violations" (citation and quotation marks omitted)); *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1463 n.31 (S.D.N.Y. 1985) ("Courts are not policemen of the legal profession; that is a matter for the disciplinary arm of the bar.  Disqualification is granted to protect the integrity of the proceedings, not to monitor the ethics of attorneys' conduct.").  Moreover, in deciding a such a motion, the Court must strive "to balance 'a client's right freely to choose his counsel' against 'the need to maintain the highest standards of the profession.'"  *Hempstead Video*, 409 F.3d at 132 (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)).

Because disqualification motions can often be strategically motivated, create delay and additional expense, and interrupt attorney-client relationships, the movant must satisfy a high standard of proof to disqualify the non-movant's counsel.  *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983) (noting "high standard of proof" for disqualification motions, in part due to the fact they are "often interposed for tactical reasons, and that even when made in the best of faith, such motions inevitably cause delay" (citation and quotation marks omitted)); *Gov't of India*, 569 F.2d at 739 (requiring "high standard of proof" for disqualification motions because a client loses time, money, and the benefit of its longtime counsel's specialized knowledge of its operations when its attorney is disqualified); *Capponi v. Murphy*, 772 F. Supp. 2d 457, 471 (S.D.N.Y. 2009) (observing that "motions to disqualify opposing counsel are disfavored in this Circuit" because they are often made for tactical purposes, cause unnecessary delay, and "impinge[] on a party's right to select counsel of its choosing"); *Clark v. Bank of N.Y.*, 801 F. Supp. 1182, 1197 (S.D.N.Y. 1992) ("[A]lthough doubts should be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and must meet a

'high standard of proof' before a lawyer is disqualified." (citations omitted)).  "Mere speculation

will not suffice" to meet this high standard, *Twin Labs., Inc. v. Weider Health & Fitness*, No. 89-

CV-949, 1989 WL 49368, at *4 (S.D.N.Y. May 4, 1989), just as the "[m]ere appearance of

impropriety will not alone serve as a sufficient basis for granting a disqualification motion,"

*Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 388 (S.D.N.Y. 2010)

(citation omitted); *see also Jose Luis Pelaez*, 366 F. Supp. 3d at 571–72 ("When there is no claim

that the trial will be tainted, appearance of impropriety is simply too slender a reed on which to

rest a disqualification order except in the rarest cases." (alteration and citation omitted)).  Finally,

resolving a disqualification motion is a "fact-intensive endeavor," *Miness v. Ahuja*, 762 F. Supp.

2d 465, 478 (E.D.N.Y. 2010), that requires "painstaking analysis of the facts and precise

application of precedent," *Jose Luis Pelaez*, 366 F. Supp. 3d at 572 (quoting, *inter alia*, *Fund of

Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977)).

> B.  Analysis

As stated, Defendants raise two separate arguments in support of their disqualification

Motion.  First, they argue that Sussman's representation violates Rule 1.18 of the New York

Rules of Professional Conduct.  (*See* Defs.' Mem. 2.)  Second, they argue that Sussman should

be disqualified under the advocate-witness rule, because Sussman's conversations with Popailo

are material to this dispute.  (*See id.* at 7.)  The Court will address each argument in turn.

> 1.  Disqualification Based on Alleged Violation of Rule 1.18

The starting point for the Court's analysis is Rule 1.18 of the New York Rules of

Professional Conduct, which provides a basis for disqualifying an attorney who "is in a position

to use confidential information obtained from a potential client."  *Miness*, 762 F. Supp. 2d at 479

(emphasis omitted).[6]  Under Rule 1.18(a), "a person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client."  N.Y. R. Prof'l Conduct 1.18(a).  Here, as stated, Sussman does not dispute that Popailo was a prospective client of his.  (*See* June 18 Sussman Letter 4.)  The Parties' dispute, rather, revolves around Rule 1.18(b) and (c), which provides:

> (b) Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client.

> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d).

N.Y. R. Prof'l Conduct 1.18(b)–(c).[7]  As noted, Defendants argue that Sussman's representation of Plaintiff runs afoul of paragraph (c) because "the interests of [] [P]laintiff in this case and a prospective client in a substantially related matter are materially adverse."  (Defs.' Mem. 2.)  But as the plain language of Rule 1.18 shows, the prohibition in paragraph (c) applies only to "[a]

---

[6] "Although not every violation of a disciplinary rule will necessarily lead to disqualification, and thus violations of state or American Bar Association disciplinary rules should not be considered conclusive, such rules often guide judicial decisions on disqualification motions."  *Benevida Foods, LLC v. Advance Magazine Publishers Inc.*, No. 15-CV-2729, 2016 WL 3453342, at *11 (S.D.N.Y. June 15, 2016) (quotation marks and citation omitted).  However, while the Court may consult these rules, the rules themselves "are not binding."  *Olajide v. Palisades Collection, LLC*, No. 15-CV-7673, 2016 WL 1448859, at *2 (S.D.N.Y. Apr. 12, 2016) (citing, *inter alia*, *Hempstead Video*, 409 F.3d at 132).

[7] Paragraph (d) of Rule 1.18 sets forth the requirements for either: (i) effectuating a waiver of a Rule 1.18 conflict, which would allow the conflicted lawyer to continue representing a client with interests materially adverse to those of a prospective client; or (ii) establishing law firm screening procedures to mitigate such a conflict, which would allow other lawyers from the conflicted lawyer's firm to continue representing the new client themselves.  *See* N.Y. R. Prof'l Conduct 1.18(d).  However, because the Court concludes that Sussman is not in violation of Rule 1.18(c), it has no need to consider this subsequent provision.

lawyer [who is] subject to paragraph (b)."  N.Y. R. Prof'l Conduct 1.18(c).  As a threshold

matter, therefore, the Court must determine whether Sussman is subject to paragraph (b)—that is,

whether he "learned information" from Popailo, his prospective client.  *See* N.Y. R. Prof'l

Conduct 1.18(b).

> a.  Whether Sussman Is a Lawyer Subject to Paragraph (b) of Rule 1.18

Paragraph (b), as written, ostensibly covers any lawyer who receives any "information"

*generally*, regardless whether that information is confidential or privileged in nature.  *Cf.* N.Y. R.

Prof'l Conduct 1.9 (governing the use of a former client's "*confidential* information" (emphasis

added)).   Because there is no question Sussman learned "information" from Popailo, a literal

reading of paragraph (b) places Sussman squarely within its scope, thus rendering him "subject

to paragraph (b)" for purposes of Rule 1.18(c).  In practice, however, courts and commentators

have construed paragraph (b) more narrowly, interpreting the word "information" to refer

specifically to *confidential* information.  *See Benevida Foods*, 2016 WL 3453342, at *11 (noting

that Rule 1.18 "provides a basis for disqualifying an attorney who is in a position to use

*confidential* information obtained from a *potential* client" (first emphasis added) (citation and

quotation marks omitted)); *Miness*, 713 F. Supp. 2d at 166 (concluding that resolution of a

disqualification motion under Rule 1.18 turned in part on whether the movant had "provided [his

prospective lawyer] with *confidential* information concerning the transactions [at issue]"

(emphasis added)); N.Y. R. Prof'l Conduct 1.6 cmt. 16 ("Confidential information includes not

only information protected by Rule 1.6(a) with respect to current clients but also information

protected by . . . Rule 1.18(b) with respect to prospective clients."); N.Y. State Bar Ass'n Comm.

on Prof'l Ethics, Op. 960 ¶ 5 (Feb. 26, 2013) ("The protection afforded to prospective clients

under Rule 1.18(c) is contingent upon the lawyer's receipt of *confidential* information."

(emphasis added)); N.Y. City Bar Ass'n Prof'l Ethics Comm., Formal Op. 2013-1 at 3–4 (Jan. 1, 2013) (observing that "information learned in a consultation with a prospective client is subject to the restriction in paragraph (b) of the Rule only if it is 'confidential information'"). Under this interpretation, Sussman would be "subject to paragraph (b)," and therefore governed by Rule 1.18(c), only if he received *confidential* information from Popailo.

As noted, after reviewing the Parties' initial submissions, the Court found there was a disputed issue of fact as to whether Sussman learned any confidential information from Popailo during their preliminary consultation. (*See* Order 5.) In Plaintiff's Opposition to Defendants' Motion, for example, Sussman averred that he did not obtain "any 'privileged information'—*not otherwise publicly available*—from his meeting with Popailo in May 2017." (Pl.'s Mem. 4 (emphasis added).) But in an affidavit submitted in support of Defendants' Motion, Popailo asserted that he "did provide information to [Sussman] that was not public knowledge." (Popailo Aff. ¶ 2.) To resolve this conflict, the Court directed Popailo to submit a supplemental affidavit for the Court's *in camera* review "identify[ing] with particularity [] any and all confidential or privileged information he disclosed to Sussman." (Order 7.) The Court noted that it would "give little weight to vague, unsubstantiated assertions that non-public information was disclosed." (*Id.*) Though Sussman had already described the content of his consultation with Popailo in considerable detail, (*see, e.g.*, June 18 Sussman Letter 2–3), he too was invited to file a supplemental affidavit under seal.

Having reviewed Sussman and Popailo's supplemental submissions, the Court has little trouble concluding that Sussman did receive confidential information during his consultation with Popailo. "Confidential information consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client

privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information

that the client has requested be kept confidential." N.Y. R. Prof'l Conduct 1.6(a) (quotation

marks omitted); *see also Mayers v. Stone Castle Partners, LLC*, 126 A.D.3d 1, 7 (1st Dep't

2015) (applying Rule 1.6(a)'s definition of confidential information with respect to a

disqualification motion under Rule 1.18). In his sealed affidavit to the Court, Popailo avers that

during his consultation with Sussman, he described for Sussman the circumstances surrounding

his April 2017 termination as Director of Parks and Recreation. (*See* Sealed Popailo Aff. ¶¶ 3–

4.) More specifically, Popailo conveyed particular details about a video in which he had

allegedly been captured using a racial epithet, an allegation Popailo denies. (*See id.* ¶ 4.)[8]

Notably, the confidential disclosures described by Popailo in his sealed affidavit are consistent

with Sussman's own description of his consultation with Popailo, which Sussman had outlined in

a *publicly filed* letter to this Court four months earlier. (*See* June 18 Sussman Letter 2.) As

relevant here, Popailo reportedly told Sussman that he had been falsely accused of using a racial

epithet in a video that was briefly made public. (*Id.* at 1–2.) For obvious reasons, the details

surrounding Popailo's alleged remarks—specifically that they involved the use of a racial

epithet—are "likely to be embarrassing or detrimental to [Popailo] if disclosed," *see* N.Y. R.

Prof'l Conduct 1.6(a), despite the fact that Popailo denied having made the remark, (*see* June 18

Sussman Letter 2).

---

[8] Ordinarily, the Court would not disclose the particular contents of a sealed affidavit submitted for its *in camera* review. *Cf. Benevida Foods*, 2016 WL 3453342, at *2 (describing the contents of a sealed affidavit in general terms); *In re MarketXT Holdings Corp.*, Bankr. No. 04-12078, Adversary No. 05-01268, 2005 WL 3789407, at *1 (Bankr. S.D.N.Y. Apr. 20, 2005) (same with respect to privileged memorandum submitted for *in camera* review). Here, however, the assertions in Popailo's sealed affidavit are identical to those previously made by Sussman in a letter publicly filed on the docket in this case. (*See* June 18 Sussman Letter 2.)

Although confidential information "does not ordinarily include . . . information that is generally known in the local community," N.Y. R. Prof'l Conduct 1.6(a), there is little evidence that the specific nature of Popailo's alleged remarks was "generally known" throughout the Chester community. To illustrate that Popailo's termination was widely known in the local community, Sussman attached four articles from Chester's local newspaper, *The Chronicle*, to his June 18 letter. (*See* June 18 Sussman Letter Unnumbered Exs. 1–4.) But although three of those articles reference Popailo's dismissal, and one article references the putative video precipitating his departure, not one article references specific allegations of use of a racial epithet. (*See id.*) For example, one of the articles references an April 12, 2017 Town Board meeting at which the video was briefly discussed. (*See* June 18 Sussman Letter Unnumbered Ex. 2 (Frances Ruth Harris, *Walter Popailo dismissed as parks director*, The Chronicle, Apr. 24, 2017).) The Court has reviewed video footage of the meeting, available online, but there is no mention of the specific allegations surrounding the video, and, indeed, the Town Board members explicitly decline to discuss the matter in detail. *See* Town of Chester, NY, *Town Board Meeting April 12, 2017*, YouTube (Apr. 18, 2017), https://www.youtube.com/watch?v=jPW9JNnDIDA &feature=emb_title.[9] The Court recognizes that in a small town such as Chester, the most damning allegation regarding Popailo's video may well have achieved some circulation throughout the town, especially in the age of social media. (*See* June 18 Sussman Letter Unnumbered Ex. 2 (stating that Town Board members had seen the video and reporting that, at the Town Board's April 12, 2017 meeting, Vincent Finizia, chair of the Town's zoning board of appeals, told Town Board members that he had received "numerous phone calls" and had been "stopped in the middle of the street" about the video)).) But Sussman nevertheless has failed to

---

[9] The relevant exchange begins at 46:40.

establish that the "embarrassing" and "detrimental" allegation Popailo disclosed to him in

confidence was "generally known in the local community." N.Y. R. Prof'l Conduct 1.6(a).[10]

Because Sussman learned confidential information from Popailo, he is "[a] lawyer subject to

paragraph (b)" for purposes of Rule 1.18(c). *See* N.Y. R. Prof'l Conduct 1.18(c).

Apart from the "embarrassing" and "detrimental" information Sussman learned from

Popailo, he was in receipt of confidential information for a second reason. As stated,

confidential information includes information "protected by the attorney-client privilege." N.Y.

R. Prof'l Conduct 1.6(a). "The attorney-client privilege protects confidential communications

between client and counsel made for the purpose of obtaining or providing legal assistance," *In

re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007), and therefore "may attach to a prospective

client's 'initial statements' to an attorney who is not ultimately hired," *Newmarkets Partners,

LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.*, 258 F.R.D. 95, 100 (S.D.N.Y. 2009) (citing *United

States v. Dennis*, 843 F.2d 652, 656 (2d Cir. 1988)). In his June 18 letter to the Court, Sussman

---

[10] The Court cannot overlook the awkward posture in which it reaches this conclusion. For regardless whether the specific allegation against Popailo was "generally known in the local community" when Defendants filed their disqualification Motion, it became a matter of public record when Sussman disclosed it in a publicly filed letter with the Court. (*See* June 18 Sussman Letter 2.) As noted, Rule 1.18(b) provides that a lawyer who receives confidential information from a prospective client "shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client." N.Y. R. Prof'l Conduct 1.18(b). Rule 1.9, in turn, prohibits lawyers from using confidential information protected by Rule 1.6 "except as these Rules would permit or require with respect to a current client," *see* N.Y. R. Prof'l Conduct 1.9, including "to defend the lawyer . . . against an accusation of wrongful conduct," *see* N.Y. R. Prof'l Conduct 1.6(b)(5)(i). It may be that Sussman finds safe harbor in Rule 1.6(b)(5)(i)'s exception to the prohibition in Rule 1.18(b). Although the Court need not decide this issue, *see U.S. Football League*, 605 F. Supp. at 1463 n.31 (observing that federal courts "are not policemen of the legal profession"), in the future, Sussman would be well advised to file documents containing such sensitive material under seal, particularly in a proceeding where, as here, his professional conduct is in question. Indeed, to be clear, in resolving this Motion, the Court is not excusing Sussman's conduct in publicly filing the letter describing the confidential information Popailo provided him.

not only describes the information Popailo provided to him, but also outlines the basic legal

assessment he provided to Popailo in return:

> [Popailo] denied using [a racial epithet] and explained his perspective at a meeting
> at my home on the afternoon of Saturday, May 13, 2017.  He explained that the
> Town attorney had investigated the matter . . . , exonerated him of using the
> [epithet] but, even with that, the Town Supervisor demanded that he resign.  When
> he refused, he was dismissed.  He acknowledged being on probation.  I explained
> that absent some other agreement, his probation was 52 weeks and that he had just
> recently been appointed following his taking and passing a Civil Service
> examination for this job.  I explained that, since he was on probation, the Town
> Board had the right to dismiss him for any reason or no reason so long as it did not
> engaging [sic] in prohibited discrimination or retaliation, which he did not claim.

(June 18 Sussman Letter 2.)  What Sussman has described is a paradigmatic communication

protected by the attorney-client privilege.  "Most courts have acknowledged, as a general matter,

that an attorney-client relationship exists if the party divulging confidences and secrets to an

attorney believes that he is approaching the attorney in a professional capacity with the intent to

secure legal advice."  *Schiller v. City of New York*, 245 F.R.D. 112, 116 (S.D.N.Y. 2007)

(alteration, citation, and quotation marks omitted).  Here, Popailo has represented—on more than

one occasion—that he "believed [his conversations with Sussman] were confidential and

protected by attorney-client privilege," (*see, e.g.*, Popailo Aff. ¶ 2), an assertion that is supported

by Sussman's own description of their conversation.  Thus, because the information Popailo

disclosed to Sussman was protected by the attorney-client privilege, it constitutes "confidential

information" for this reason as well.  *See* N.Y. R. Prof'l Conduct 1.6.

Because Sussman, having received "confidential information" from Popailo, is "[a]

lawyer subject to paragraph (b)" of Rule 1.18, the Court now turns to consider whether Sussman

should be disqualified under Rule 1.18(c).

### b.  Whether Sussman Is In Violation of Rule 1.18(c)

To meet their burden of proof, Defendants must show that Sussman (1) "represent[s] a client with interests materially adverse to those of a prospective client," (2) "in the same or a substantially related matter," and (3) that Sussman "received information from the prospective client that could be significantly harmful to that person in the [same or substantially related] matter."  N.Y. R. Prof'l Conduct 1.18(c).  Defendants have failed to establish all three of these requirements.  However, the Court will first consider whether Defendants even have standing to bring a disqualification motion on behalf of Popailo.

### i.  Whether Defendants Have Standing to Bring Motion

Popailo's absence from this suit raises the serious threshold question whether Defendants even have standing to bring this disqualification Motion, which is effectively being brought on Popailo's behalf.

The Court notes at the outset that "no Second Circuit case has ever approved of such third-party disqualification motions."  *Satina v. N.Y.C. Human Res. Admin.*, No. 14-CV-3152, 2015 WL 6681203, at *2 (S.D.N.Y. Nov. 2, 2015); *see also Skidmore v. Warburg Dillon Read LLC*, No. 99-CV-10525, 2001 WL 504876, at *3 (S.D.N.Y. May 11, 2001) (noting that "this standing question has not been addressed directly by the Second Circuit").  But recent authority from this District casts doubt on whether Defendants have standing to bring their Motion.

In *Satina v. New York City Human Resources Administration*, a case factually similar to the instant suit, the plaintiff sued the New York City Human Resources Administration (the "City") alleging race, ethnicity, national origin, and gender discrimination in violation of Title VII, state, and local law.  2015 WL 6681203, at *1.  Specifically, the plaintiff alleged that after she complained about receiving less pay than her male colleagues, her supervisors "retaliated

against her by demoting her, reducing her pay, and subjecting her to a hostile work environment." *Id.* In an earlier action, the plaintiff's lawyer had represented one of the plaintiff's supervisors in a similar discrimination suit against the City. *Id.* The City moved to disqualify the plaintiff's lawyer on behalf of this supervisor, arguing that the plaintiff's interests were "materially adverse" to the supervisor's interests because the plaintiff's case "relie[d] on attacking the accuracy and legality of [the supervisor's] actions in supervising [the] plaintiff and giving [the] plaintiff negative performance evaluations." *Id.* The supervisor's involvement in the subsequent case, the City argued, was therefore "tantamount to that of a defendant." *Id.* Denying the motion, the court concluded in part that "[s]ince the City is not [the plaintiff's lawyer's] former client, it cannot move for disqualification." *Id.* at *2.

In reaching this conclusion, the court in *Satina* sought to distinguish *Skidmore v. Warburg Dillon Read LLC*, a case in which the court denied a disqualification motion brought on behalf of a nonparty witness, but explicitly rejected the argument that a party lacks standing to bring a disqualification motion on behalf of a nonparty. *See id.*; *Skidmore*, 2001 WL 504876, at *3 (citing *Planning & Control, Inc. v. MTS Grp., Inc.*, No. 91-CV-2763, 1992 WL 51569, at *2 (S.D.N.Y. Mar. 11, 1992) (concluding that "movants who [are] not clients or former clients of opposing counsel" may bring disqualification motions); *Altschul v. Paine Webber, Inc.*, 488 F. Supp. 858, 860 n.1 (S.D.N.Y. 1980) (stating that the movant, who was not a former client of the allegedly conflicted lawyer, had standing to bring the action because "[c]ompetence to raise disqualification is not limited to former or aggrieved clients")). The *Satina* court concluded that *Skidmore* had been "superseded" four years later by the Second Circuit's decision in *Hempstead Video*, 409 F.3d 127, a case in which the court, reciting its longstanding rule for disqualification in cases of successive representation, stated that an attorney may be disqualified if, in part, "the

moving party is a former client of the adverse party's counsel."  *See Satina*, 2015 WL 6681203, at *2 (citing *Hempstead Video*, 409 F.3d at 133).  The *Satina* court interpreted *Hempstead Video* as having "limit[ed] disqualification to cases where 'the moving party is a former client of the adverse party's counsel.'"  2015 WL 6681203, at *2 (citation omitted).

   *Satina* arguably overstated the significance of *Hempstead Video*.  Indeed, the Second Circuit had articulated the ostensible requirement that "the moving party [be] a former client of the adverse party's counsel" long before *Hempstead Video* (and, for that matter, *Skidmore*).  *See Evans*, 715 F.2d at 791 (stating the same rule); *see also Cheng v. GAF Corp.*, 631 F.2d 1052, 1055–56 (2d Cir. 1980) (stating that, for a court to disqualify an attorney based on successive representation, the "*former client* need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the *former client*" (emphases added)), *judgment vacated on other grounds*, 450 U.S. 903 (1981); *Emle Indus., Inc. v. Patentex, Inc.*, 478 F.2d 562, 570–71 (2d Cir. 1973) (stating the same rule). Also before *Hempstead Video*, some lower courts took the view that, despite the apparently narrow language in cases such as *Evans* (and later echoed in *Hempstead Video* itself), the Second Circuit's disqualification rule does not preclude a disqualification motion brought by someone other than a former client.  For example, in *Planning & Control, Inc. v. MTS Group, Inc.*—one of the cases relied upon in *Skidmore*—the court acknowledged the narrow language in *Evans* but nevertheless found that the moving defendants, who were not former clients of the allegedly conflicted lawyer, had standing to bring such a motion on behalf of a nonparty who *was* a former client.  *See* 1992 WL 51569, at *2.  The court noted that despite the language in *Evans*, "several courts [in the Second Circuit] ha[d] conferred standing upon movants who were not clients or

former clients of opposing counsel." *Id.* (citing *SMI Indus. Canada, Ltd. v. Caelter Indus., Inc.*, 586 F. Supp. 808 (N.D.N.Y. 1984); *Altschul*, 488 F. Supp. at 860 n.1) (observing that "[e]thical concerns dictate that other persons, especially attorneys, be permitted to raise the issue of attorney misconduct").  Because *Hempstead Video* merely recited the narrow language from previous cases, but did not address lower courts' determination that this language need not be strictly applied, it is a stretch to state that *Hempstead Video* "superseded" *Skidmore*.  *Cf. Satina*, 2015 WL 6681203, at *2.

        Thus, there appears to be a disagreement in this District as to whether parties such as Defendants may bring a disqualification motion under the circumstances in this case.  And although the cases just discussed involved alleged conflicts based on an attorney's representation of a *former* client (as opposed to an attorney's consultation with a *prospective* client), the standards governing each scenario are substantially the same, *compare* N.Y. R. Prof'l Conduct 1.9 (prohibiting lawyers "who ha[ve] formerly represented a client in a matter" from "thereafter represent[ing] another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client"), *with* N.Y. R. Prof'l Conduct 1.18 (imposing the same standard with respect to former prospective clients, along with the heightened condition that a lawyer's representation is only prohibited if he possesses information "significantly harmful" to the former prospective client in the same or substantially related matter), and courts have analyzed cases in the latter context using cases drawn from the former, *see, e.g.*, *Bennett Silvershein Assocs. v. Furman*, 776 F. Supp. 800, 803–04 (S.D.N.Y. 1991) (relying on cases evaluating former-client conflicts to resolve a disqualification motion predicated on a prospective-client relationship).  Indeed, at least one court analyzing a prospective-client conflict has echoed the narrow standing language that appears in cases such as

*Hempstead Video* and *Evans*.  *See Benevida Foods*, 2016 WL 3453342, at *13 (stating that disqualification under Rule 1.18 requires "a 'prospective client' relationship *between the moving party and the attorney it is seeking to disqualify*" (emphasis added) (citation omitted)).  If the Court were to follow this rule literally, much as the court did in *Satina*, Defendants would lose the Motion on this basis alone.  Given the unsettled nature of this issue, however, the Court declines to resolve the Motion on this basis, particularly without further guidance from higher courts.

### ii.  Whether Plaintiff & Popailo Have Materially Adverse Interests

Even if Defendants have standing to bring the instant Motion, Plaintiff's interests are not "materially adverse" to those of Popailo, Sussman's (former) prospective client.  Without supporting case law, Defendants argue in conclusory fashion that Plaintiff and Popailo's interests are "materially adverse" because Popailo "may need to be deposed, and may be called as a witness at trial."  (Defs.' Mem. 5.)  Defendants' argument flies in the face of relevant authority to the contrary.

In *Satina*, as discussed *supra*, the defendants sought to disqualify the plaintiff's lawyer based on the lawyer's prior representation of the plaintiff's supervisor in a separate action against the City.  2015 WL 6681203, at *1.  Although the supervisor was not a defendant in the plaintiff's action against the City, the defendants argued that her interests were "materially adverse" to those of the plaintiff because the plaintiff's case "relie[d] on attacking the accuracy and legality of [the supervisor's] actions in supervising [the] plaintiff and giving [the] plaintiff negative performance evaluations."  *Id.* Thus, argued the City, the supervisor's involvement in the subsequent case was "tantamount to that of a defendant."  *Id.*  The court concluded that even if such standing were present, the supervisor was not "tantamount" to a defendant, and her

interests were not "materially adverse" to those of the plaintiff.  *See id.* at *2.  Specifically, the court observed that even if the plaintiff's lawyer "were to impeach [the supervisor] or otherwise argue that [the supervisor] was complicit in the City's employment discrimination against [the plaintiff] . . . , that alone would not render [the plaintiff's lawyer's] representation of [the plaintiff] materially adverse to [the supervisor's] interests."  *Id.*  "Such a scenario," the court concluded, "may be embarrassing to [the supervisor]; it may even be unseemly to treat a former client as a hostile witness.  But no tangible prejudice would result."  *Id.* (alteration and ellipses omitted) (quoting *Skidmore*, 2001 WL 504876, at *5).

This conclusion accords with that in *Skidmore*, for although the *Satina* court found *Skidmore*'s analysis faulty with respect to standing, it found the case "instructive" with regard to the issue of material adversity.  *See* 2015 WL 6681203, at *1 n.1.  In *Skidmore*, the plaintiff sued his former employer for age discrimination, alleging in relevant part that one of the defendant's senior managers had said he wished to "lower the age of the sales force."  2001 WL 504876, at *1.  The plaintiff claimed to have learned of this comment from one of his colleagues who, coincidentally, had previously retained the plaintiff's lawyer to bring his own age discrimination suit against the defendant.  *Id.* at *2.  "When deposed, however, [the colleague] disputed every aspect of [the plaintiff's] account," including the assertion that he had discussed the alleged remark with the plaintiff.  *Id.*  The defendant sought to disqualify the plaintiff's lawyer, arguing that his representation was "materially adverse" to the interests of the plaintiff's colleague, who was not a party to the suit.  *See id.* at *5.  But the "sole support" for this argument was that, if the case proceeded to trial, the plaintiff's lawyer would need to cross-examine the plaintiff's colleague, given the latter's deposition testimony.  *Id.*  The court concluded this did not constitute material adversity.  *See id.* (observing that an "appearance of impropriety is simply too

slender a reed on which to rest a disqualification order except in the rarest cases" (quoting
*Nyquist*, 590 F.2d at 1247)); *see also Gurniak v. Emilsen*, 995 F. Supp. 2d 262, 272 (S.D.N.Y.
2014) (relying on *Skidmore* and concluding "that cross-examination of the former client is
insufficient on its own to disqualify [the] [p]laintiff's counsel"); *Med. Diagnostic Imaging PLLC
v. CareCore Nat'l, LLC*, 542 F. Supp. 2d 296, 313–14 (S.D.N.Y. 2008) ("The risk that an
attorney may cross-examine a former client is not sufficient to disqualify an attorney.").

      Here, as in *Satina* and *Skidmore*, Defendants seek to disqualify their adversary's attorney
on behalf of a (potential) nonparty witness whose interests, they allege, are "materially adverse"
to Plaintiff's. (*See* Defs.' Mem. 5.) Much like the defendants in *Satina* and *Skidmore*,
Defendants here argue that this adversity stems from the fact that Sussman may have to cross-
examine Popailo, his former prospective client, as a hostile witness. (*See id.*) And just as the
plaintiff's case in *Satina* allegedly "relie[d] on attacking the accuracy and legality of [the
supervisor's] actions," 2015 WL 6681203, at *1, here, similarly, Plaintiff's case allegedly relies
on scrutinizing "[t]he facts of [Popailo's] termination, as well as [] Popailo's employment history
with the Town," (*see* Defs.' Mem. 4). But as *Satina* and *Skidmore* both illustrate, none of this is
sufficient to constitute "material adversity." Insofar as Defendants fear that Sussman might
cross-examine Popailo using confidential information *specifically*, (*see id.* at 5–6), and therefore
seek to distinguish *Satina* or *Skidmore* on this basis, *cf. Satina*, 2015 WL 6681203, at *1
("[Plaintiff's lawyer] has declared that he is not aware of any privileged information that he
gained during his representation of [the nonparty witness] that would be relevant in this
litigation."); *Skidmore*, 2001 WL 504876, at *4 (noting that the allegedly conflicted lawyer had
sworn that he never disclosed any confidences from his former client), the Court finds, as
discussed *infra*, that there is very little—if any—confidential information that would not have

been disclosed in discovery.  To the extent Defendants are still concerned about the prospect of

Sussman cross-examining Popailo using confidential information, "the Court can and will

address the issue if [Sussman] improperly attempts to use any such confidentially acquired

background information at trial."  *DeVittorio v. Hall*, Nos. 07-CV-812, 07-CV-1956, 2007 WL

4372872, at *11 (S.D.N.Y. Dec. 12, 2007).

Having found that Plaintiff's interests are not "materially adverse" to those of Popailo,

the Court need continue no further.  In the interest of addressing other arguments raised by

Defendants, however, the Court will also consider the two final requirements of Rule 1.18—a

"substantially related matter" and Sussman's alleged possession of "significantly harmful"

information.

### iii.  Whether This Action Is a Substantially Related Matter

Even if Plaintiff and Popailo's interests were materially adverse, this matter is not

"substantially related" to Sussman's prior consultation with Popailo or the litigation they briefly

contemplated.  Although the term "substantially related matter" is not defined in Rule 1.18 or the

comments thereto, it does appear in the analogous context of Rule 1.9 (governing duties to

former clients), and courts long interpreted its meaning under the Canons of the New York Code

of Professional Responsibility (the "Professional Code"), which were superseded by the New

York Rules of Professional Conduct in April 2009.  *See* N.Y. R. Prof'l Conduct 1.9 cmt. 3

(stating that "[m]atters are 'substantially related' for purposes of [Rule 1.9] if they involve the

same transaction or legal dispute"); *see also, e.g.*, *Rella v. N. Atl. Marine, Ltd.*, No. 02-CV-8573,

2004 WL 2480409, at *4 (S.D.N.Y. Nov. 3, 2004) (interpreting the term as used in Canon 5 of

the Professional Code, which pertained to a lawyer's duty to former clients); *Red Ball Interior

Demolition Corp. v. Palmadessa*, 908 F. Supp. 1226, 1239 (S.D.N.Y. 1995) (same); *Allbrand*

*Appliance & Television Co., Inc. v. Advent Corp.*, No. 78-CV-2510, 1978 WL 1446, at *2

(S.D.N.Y. Dec. 4, 1978) (applying the "substantially related" test with respect to Canon 4's

"requirement that an attorney not disclose the confidences of his client," and Canon 9's

"requirement that an attorney avoid the appearance of impropriety").[11]  Although cases involving

*former* client conflicts are more common than those involving *prospective* client conflicts, courts

have interpreted the "substantially related" standard uniformly in both contexts before and after

the New York Rules of Professional Conduct were enacted in 2009.  *Compare Gurniak*, 995 F.

Supp. 2d at 272 (stating, with respect to an alleged former-client conflict under Rule 1.9, that

"[a] pending matter is substantially related to the subject matter of an attorney's prior

representation when the relationship between issues in the prior and present cases is patently

clear . . . [and when] the issues involved have been 'identical' or 'essentially the same'" (citation

and some quotation marks omitted); *Clark*, 801 F. Supp. at 1198 (same with respect to alleged

former-client conflict under the Professional Code), *with In re Persaud*, 467 B.R. 26, 41 (Bankr.

E.D.N.Y. 2012) (stating, with respect to an alleged prospective-client conflict under Rule 1.18,

that "in order for two matters to be substantially related, it must be shown that the relationship

between the two actions is 'patently clear,' or . . . the actions are 'identical' or 'essentially the

same'" (citation and some quotation marks omitted)); *Bennett*, 776 F. Supp. at 803–04 (same

with respect to alleged prospective-client conflict under the Professional Code).

The Second Circuit "has applied the 'substantially related' prong strictly, requiring the

moving party to demonstrate that the relationship between the two [matters] is 'patently clear,' or

---

[11] Although New York's Rules of Professional Conduct have replaced the Professional
Code, "the case authority interpreting the old canons continues to be probative on issues that are
analyzed under the new rules."  *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-CV-488, 2011
WL 3251500, at *7 n.4 (S.D.N.Y. July 25, 2011) (alteration omitted).

that the [matters] are 'identical' or 'essentially the same.'" *Bennett*, 776 F. Supp. at 803 (quoting *Gov't of India*, 569 F.2d at 740) (invoking the Second Circuit's "substantially related" standard to consider an alleged conflict stemming from an attorney's prior consultation with a prospective client); *In re Persaud*, 467 B.R. at 41 (same).  Applying this standard in the context of prospective-client conflicts, one court in this District has explained that an attorney's consultation with a prospective client "should be considered sufficiently related to a later case to warrant disqualification only to the degree that the information the client disclosed in that earlier consultation is useful in the later case." *Bennett*, 776 F. Supp. at 804.  To be disqualified, the attorney must have "gain[ed] some advantage not otherwise available but for the prior confidential relationship, even if that advantage goes only to background matters." *Id.*  To determine whether previously disclosed information is "useful" in a later matter, courts "compar[e] the information alleged to have been imparted in the prior [consultation] with the allegations in the current dispute[,]" and, "[i]f the two are congruent, then the previously acquired confidential information is at least potentially useful." *Id.*

Taken at face value, the test set forth in *Bennett* could conceivably offer Defendants a foothold.  Here, the "information alleged to have been imparted in the prior [consultation]" between Popailo and Sussman had to do with Popailo's termination as a Town employee. (*See* June 18 Sussman Letter 2; Sealed Popailo Aff. ¶¶ 3–4.)  For purposes of the *Bennett* comparison, however, the Court only considers information "not otherwise available but for the prior confidential relationship." *Bennett*, 776 F. Supp. at 804.  The Court notes that by the time Sussman and Popailo began corresponding on May 12, 2017, (*see* Suppl. Sussman Decl. 1), Chester's local newspaper had already reported that Popailo was a probationary employee who had been "terminated after video reportedly taken of him at the NYS Association of Towns

Convention . . . was posted on Facebook," (*see* June 18 Sussman Letter Unnumbered Ex. 2).

Thus, for purposes of the *Bennett* comparison, the relevant information is the specific detail

surrounding Popailo's termination, most notably the allegation that he used a racial epithet.

Comparing this information to the "allegations in the current dispute," it is conceivable

this confidential information could provide Sussman with "some advantage not otherwise

available but for the prior confidential relationship, even if that advantage goes only to

background matters." *Bennett*, 776 F. Supp. at 804.  Specifically, this information could be

tangentially relevant to Plaintiff's second cause of action, which alleges that Plaintiff was a

superior candidate for the Sugar Loaf Position, the hiring for which took place *after* Popailo had

been terminated.  In making this claim, Plaintiff relies in part on the general (and publicly

reported) fact that Popailo previously had been terminated.  (*See* Compl. ¶ 24 (describing

termination); *id.* ¶ 41 (touting Plaintiff's "unsullied employment record")).  The Complaint, to be

sure, does not rely on any of the confidential information allegedly disclosed to Sussman in

confidence.  *Cf. Zalewski v. Shelroc Homes, LLC*, 856 F. Supp. 2d 426, 430 (N.D.N.Y. Mar. 6,

2012) (disqualifying an attorney who, after holding a preliminary consultation with the

defendants, became counsel for the plaintiffs and filed a third amended complaint that allegedly

"contained new factual allegations [based on] information [the] [d]efendants had disclosed in

confidence to [the attorney] and [which] had not appeared in previous iterations of the

complaint").  And Sussman argues—correctly—that "[t]his case is not about Mr. Popailo's

conduct," and that "the relevant inquiry is what Town decision-makers knew and what Mr.

Popailo represented to them during, for instance, his interview in 2019 for the [Sugar Loaf

Position]."  (June 18 Sussman Letter 4–5.)

But Sussman could still use the confidential information disclosed to him to his client's advantage.  Plaintiff's argument, after all, is comparative in nature.  Her qualifications and employment history are significant only to the extent they are stronger or weaker than Popailo's.  And thus, any evidence that tends to cast doubt on Popailo's fitness for the job would, by definition, improve Plaintiff's own standing with respect to that same job.  Although Popailo disputes the allegation, evidence of the allegation itself could still harm Defendants' case.  For example, if jurors hear evidence of the allegation (regardless of its credibility), they may cast a more critical eye toward Popailo, as well as the Town Board members who chose to re-hire him two years later.  And if the evidence were to suggest that the allegation was credible, and that Defendants chose to ignore the allegation when re-hiring Popailo, such evidence could lend support to Plaintiff's gender discrimination claim.  In this sense, then, Sussman arguably "gain[ed] some advantage not otherwise available but for the prior confidential relationship." *Bennett*, 776 F. Supp. at 804.

Although Sussman conceivably obtained "some advantage" through the confidential information disclosed by Popailo, the Court nevertheless concludes that this Action does not constitute a "substantially related matter" for purposes of Rule 1.18.  Two factors compel this conclusion.

First, *Bennett* provides that, to be disqualified, the attorney "must gain some advantage not otherwise available *but for the prior confidential relationship*." *Id.* (emphasis added). Although Sussman, as just discussed, may have gained some advantage from his consultation with Popailo, the information Popailo disclosed regarding the allegation of a racial epithet almost certainly would have been disclosed during discovery.  As noted, the circumstances behind Popailo's termination could potentially be relevant to Plaintiff's second cause of action insofar as

they speak to his fitness for the Sugar Loaf Position.  Thus, even if Popailo's consultation with

Sussman had never occurred, it is implausible that Sussman would not have sought information

regarding Popailo's termination in the normal course of discovery, particularly in view of public

reporting that Popailo had been "terminated after video reportedly taken of him at the NYS

Association of Towns Convention . . . was posted on Facebook."  (*See* June 18 Sussman Letter

Unnumbered Ex. 2.)  Accordingly, any advantage Sussman gained through his consultation with

Popailo likely was "otherwise available" despite the "prior confidential relationship."  *See*

*Bennett*, 776 F. Supp. at 804; *cf. Xiao Hong Liu v. VMC E. Coast LLC*, No. 16-CV-5184, 2017

WL 4564744, at *4 (E.D.N.Y. Oct. 11, 2017) (finding that confidential information disclosed to

an attorney by a prospective client did not constitute "significantly harmful" information for

purposes of Rule 1.18 because such information "would have been disclosed in discovery

regardless"); *Benevida*, 2016 WL 3453342, at *11 (observing that information is not deemed

"significantly harmful" for Rule 1.18 purposes if it is "likely to be revealed at [the moving

party's] deposition or in other discovery" (citation omitted)).  Although this determination

resolves whether this Action constitutes a "substantially related matter," the Court will also

address a second basis for its conclusion.

The second reason this Action is not "substantially related" to Sussman and Popailo's

prior consultation involves a closer examination of how this standard has been applied in cases

involving prospective-client conflicts.  At first glance, *Bennett*'s formulation of this standard

may suggest that any information "not otherwise available but for [a] prior confidential

relationship" is sufficient to render a subsequent matter "substantially related" to a prior

consultation so long as the information is merely "useful."  *See* 776 F. Supp. at 804.  But *Bennett*

also states—without elaboration—that the disclosed information must be "congruent" with the

allegations in the subsequent dispute. *Id.* As numerous cases in the analogous context of former-client conflicts have explained, "congruence" refers to *factual* congruence. *See, e.g.*, *Olajide*, 2016 WL 1448859, at *3 (explaining that the relevant inquiry "does not turn on whether the legal claims or underlying theories are similar, but rather whether the successive representations share common material factual issues" (citation and emphases omitted)); *Revise Clothing*, 687 F. Supp. 2d at 392 ("It is the congruence of *factual* matters, rather than areas of law, that establishes a substantial relationship between representations for disqualification purposes." (quoting *U.S. Football League*, 605 F. Supp. at 1460 n.26)). That is, there must be "common factual issues that are material" to both matters. *Leslie Dick Worldwide, Ltd. v. Soros*, No. 08-CV-7900, 2009 WL 2190207, at *9 (S.D.N.Y. July 22, 2009) (emphasis and citation omitted); *see also U.S. Football League*, 605 F. Supp. at 1457, 1459 (explaining that the "congruence of issues" necessary to show a "substantial relationship" between two matters is present "if the facts giving rise to an issue which is material in both the former and the present litigations are as a practical matter the same"). Thus, the relevant inquiry is not merely whether a prospective-client consultation has yielded "useful" information for a subsequent matter. In practice, courts have required that the two matters share an "identity of [factual] issues" in order to be deemed "substantially related." *See In re MarketXT Holdings Corp.*, 2005 WL 3789407, at *5.

Consider *Lorber v. Winston*, No. 12-CV-3571, 2012 WL 5904522 (E.D.N.Y. Nov. 26, 2012), a RICO and fraud case in which one of the defendants moved to disqualify the plaintiff's lawyer based on a prior consultation this defendant had held with the lawyer years earlier. *Id.* at *1. Over a decade before the plaintiff brought her action, the lawyer had consulted with the defendant regarding a criminal matter in which the defendant was being investigated for possible

financial crimes. *Id.* at *3. This consultation included a discussion of the "potential charges against [the defendant] and the related facts." *Id.* at *4. Although the lawyer ultimately did not represent the defendant in this matter, when the plaintiff, represented by this same lawyer, sued the defendant approximately 12 years later, her complaint contained the allegation that, "sometime during the year 2000 [the defendant] learned that his brokerage firm, . . . and many [of its] principals and employees were under investigation . . . for securities fraud, money laundering[,] and other related criminal activity." *Id.* at *10. In view of the defendant's prior consultation with the lawyer, the court found that the defendant would be prejudiced with respect to this allegation. *See id.* Although the prior consultation and the plaintiff's subsequent case "[were] not identical," the court explained, the plaintiff's complaint was using the defendant's prior criminal conduct "not only [to] provide context, but also to suggest that [the defendant] [had] misrepresented the seriousness of his criminal case to the [p]laintiff." *Id.* at *11. Thus, the court held that the prospective-client relationship provided a basis for disqualifying the lawyer. *Id.*

Similarly, in *Fierro v. Gallucci*, No. 06-CV-5189, 2007 WL 4287707 (E.D.N.Y. Dec. 4, 2007), one of the plaintiffs had consulted with a lawyer regarding potential claims he might bring against the defendants based on an alleged fraudulent scheme. *Id.* at *2–3. According to this plaintiff, he and the lawyer "discussed the underlying facts of the case, potential claims against the defendants, potential defenses available to the defendants, dollar amounts at risk, and relevant case law and other legal theories applicable to the facts in issue." *Id.* at *2 (record citation omitted). The plaintiffs decided not to retain this lawyer, but when they brought suit against the defendants almost two years later, the lawyer's firm was retained to represent the defendants. *Id.* at *3. Granting the plaintiffs' disqualification motion, the court found that the

preliminary consultation was "substantially related" to the subsequent litigation because "the issues" in both matters "[were] identical." *Id.* at *7.

Finally, in *In re MarketXT Holdings Corp.*, an adversary proceeding stemming from the debtor's Chapter 11 bankruptcy, the debtor's trustee sought to disqualify the law firm representing the defendants, a group of entities that were recipients of alleged fraudulent conveyances from the debtor. *See* 2005 WL 3789407, at *2. Prior to representing the defendants, the law firm had been retained by the debtor to evaluate the strength of prospective litigation against a separate party. *Id.* at *1. Although the law firm and debtor formed an actual, as opposed to prospective, client relationship, the nature of the firm's work on behalf of the debtor is still roughly analogous to Sussman's brief consultation for Popailo—namely, "analyzing the strength of the [plaintiff's] claims and [the defendant's] defenses." *See id.* Having reviewed, *in camera*, the legal memorandum prepared by the law firm on the debtor's behalf, the court concluded that the firm "obtained confidential information on the [d]ebtor's business," including "liquidity problems that apparently existed at the time." *Id.* As in the instant suit, then, the allegedly conflicted lawyer had gained access to sensitive (and potentially damaging) information. But in *MarketXT*, "[t]here could not [have] be[en] a closer connection between" the issue at the heart of the adversary proceeding—namely, the debtor's solvency— "and the subject matter of [the law firm's] prior representation of the [d]ebtor." *Id.* at *5. The court therefore concluded that "a congruence—indeed, an identity of issues—exist[ed]," and, having found that the two matters were "substantially related," disqualified the law firm representing the defendants." *Id.* at *6.

In each of these cases, the conflicted lawyer had obtained confidential information from an adversarial party who was actually present in the litigation. As noted, Popailo is not such a

party.  *Cf. In re Maritima Aragua, S.A.*, 847 F. Supp. 1177, 1182 (S.D.N.Y. 1994) (stating that

movants "face[d] a heightened burden to show that representation of a party that [was] not a

defendant but [was] rather a company allegedly related to a defendant [was] grounds for

disqualification").  Moreover, the confidential information obtained in each case was directly

relevant to a material issue in the litigation.  Although the circumstances of Popailo's

termination, as stated, could potentially be relevant in this Action, they do not go directly to the

heart of a material issue as was the case in *MarketXT*, *Fierro*, and *Lorber*.  *Cf. Med. Diagnostic

Imaging*, 542 F. Supp. 2d at 313–14 (concluding that two matters were not substantially related

where the "facts and issues significant" to an attorney's prior representation of certain

movants—which involved the movants' finances generally—was not "directly at issue in the

current litigation," which involved more specific allegations regarding the defendants' market

power and price fixing).  The Court might well reach a different conclusion if, for example,

Sussman had consulted with the Town Board in anticipation of defending it against an

employment discrimination suit, obtaining sensitive information about its hiring and

compensation practices in the process, only to switch sides down the road and represent Plaintiff

in the instant dispute.  *Cf., e.g.*, *Benevida Foods*, 2016 WL 3453342, at *14–15 (disqualifying a

law firm that had switched sides in this manner); *Zalewski*, 856 F. Supp. 2d at 436 (same);

*Fierro*, 2007 WL 4287707, at *7.  But in view of the facts before it, the Court concludes there is

not an "identity of [factual] issues" between Sussman's prior consultation with Popailo and his

current representation of Plaintiff such that these matters are "substantially related."  *See

MarketXT*, 2005 WL 3789407, at *5.

### iv.  Whether Disclosed Information Was "Significantly Harmful"

Although the Court need not consider the third element of Rule 1.18(c) in light of its findings above, it will briefly discuss this element lest there be any lingering doubt regarding the merits of Defendants' Motion.

As stated, Rule 1.18(c) bars a lawyer from representing a client with interests materially adverse to those of a prospective client only "if the lawyer received information from the prospective client that could be *significantly harmful* to that person" in the subsequent matter. N.Y. R. Prof'l Conduct 1.18(c) (emphasis added); *see also Xiao Hong Liu*, 2017 WL 4564744, at *4 (noting that Rule 1.18 "only prohibits adverse representation where a lawyer receives confidential information . . . that could be 'significantly harmful' to the prospective client if used in the litigation at issue").  Though not defined in Rule 1.18, "significantly harmful" information has been interpreted to include "a party's undisclosed settlement strategy, its bottom line in settlement, . . . its views and impressions of the litigation, including its thoughts on the strengths and weaknesses of the parties' respective positions, and its opinions and impressions of even public documents and facts."  *Benevida Foods*, 2016 WL 3453342, at *11 (citation, alterations, ellipsis, and quotation marks omitted).

In *Benevida Foods*, for example, the court found that in preliminary consultations with a prospective law firm, the plaintiff had disclosed "sensitive information regarding [its] assessment of its own claims, its financial situation and risk tolerance, and its litigation and settlement strategies"—in short, "precisely the type of information that, if shared, can provide an opposing party with a substantial, unfair advantage."  *Id.* at *14.  The court disqualified the firm, which had been engaged by the defendants in the same case after the plaintiffs declined to retain it.  *Id.* at *14–15; *see also Zalewski*, 856 F. Supp. 2d at 436 (disqualifying the plaintiffs' attorney, who,

in a prior, preliminary consultation with the defendants, had acquired "intimate knowledge of their views and impressions of th[e] litigation," including their "thoughts on the differences between the [architectural] designs [at issue in the copyright infringement action,] and the strengths and weaknesses of the parties' respective positions").  Similarly, in *Miness v. Ahuja*, the court disqualified the defendant's attorney, who, as a prospective attorney for and longtime "personal confidante" of the plaintiff, had gained "first-hand knowledge of the plaintiff's intimate thoughts and actions at the time of the relevant events" at issue in the case.  762 F. Supp. 2d at 481.

By contrast, courts do not consider information to be "significantly harmful" if it consists of "public information, if it merely regards the history of the dispute, or if it is likely to be revealed at the moving party's deposition or in other discovery."  *Benevida Foods*, 2016 WL 3453342, at *1 (citations, alteration, and quotation marks omitted).  Thus, in *Xiao Hong Liu*, a wage and hour case, the court declined to disqualify the plaintiffs' attorney, who had held a preliminary consultation with someone who subsequently became a defendant in a pending action, because any potentially useful information disclosed to the attorney "would have been disclosed in discovery regardless," and therefore was not "significantly harmful" to the lawyer's prospective client.  2017 WL 4564744, at *4.

As noted, the confidential information Sussman acquired, like the information in *Xiao Hong Liu*, likely "would have been disclosed in discovery regardless," and therefore does not constitute "significantly harmful" information for this reason alone.  But even if this were not the case, the Court cannot say that this information's potential harm rises to the level described in cases such as *Benevida Foods*, *Zalewski*, or *Miness*.  Sussman did not gain access to anything as sensitive as, for example, Defendants' "assessment of [their] own [defenses]" or their "litigation

and settlement strategies." *Cf. Benevida Foods*, 2016 WL 3453342, at *14.  Although Sussman

appears to have gained insight into Popailo's "thoughts and feelings" regarding his termination

from the Town, *see Miness*, 762 F. Supp. 2d at 480–81, this scenario can be distinguished from

*Miness* on two grounds.  First, Popailo's "thoughts and feelings" concern events that are not at

issue in this litigation, and they came from Popailo, who is not a party in this litigation.  The

analysis would look much different if one of the Town Board members had discussed Plaintiff's

compensation or job performance with Sussman.  Second, insofar as the confidential information

shared with Sussman is potentially harmful in this litigation, it is potentially harmful to

*Defendants*.  If the allegation against Popailo were deemed credible, Defendants would have a

harder time justifying their decision to re-hire Popailo two years later.  To warrant

disqualification under Rule 1.18(c), however, the information in question must be "significantly

harmful" to Popailo, Sussman's prospective client.  *See* N.Y. R. Prof'l Conduct 1.18(c).

Although evidence of the allegation against Popailo could carry some collateral, reputational

harm for Popailo, the type of harm envisioned in the relevant authorities is *legal* harm—that is,

harm to one of the parties in the litigation.

*     *     *

For the foregoing reasons, Sussman is not in violation of Rule 1.18(c), and the Court will

not disqualify him on this basis.

### 2.  Disqualification Based on Advocate-Witness Rule

Separately, Defendants argue that Sussman should be disqualified under the advocate-

witness rule, (*see* Defs.' Mem. 7), which "prohibits an attorney from representing a party where

the attorney will be called as a witness," *Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 578

(S.D.N.Y. 2019) (citing *Rizzuto v. De Blasio*, No. 17-CV-7381, 2019 WL 1433067, at *3

(E.D.N.Y. Mar. 29, 2019)).  As relevant here, Rule 3.7 of the New York Rules of Professional

Conduct states that "[a] lawyer shall not act as advocate before a tribunal in a matter in which the

lawyer is likely to be a witness on a significant issue of fact," unless one of several exceptions

applies.  N.Y. R. Prof'l Conduct 3.7(a).  This Rule aims to prevent "harm to the integrity of the

judicial system" that arises when "the line between argument and evidence [is] blurred."  *Murray*

*v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).  But because Rule 3.7 also "lends itself

to opportunistic abuse[,]" motions to disqualify under this Rule are subject to particularly strict

scrutiny.  *Id.* (citing *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)).

The advocate-witness rule recognizes a distinction "between an attorney who will be

called on behalf of his client and an attorney who will be called as a witness other than on behalf

of his client."  *Giuffre*, 410 F. Supp. 3d at 578; *see also Capponi*, 772 F. Supp. 2d at 471

(observing that "the so-called 'witness-advocate' rule applies in two situations: those in which

the lawyer comes to believe that he or she ought to be called as a witness on behalf of his client;

and those in which the lawyer may be called as a witness other than on behalf of his client");

*Rizzuto*, 2019 WL 1433067, at *3 (same).  "In this Circuit, motions to disqualify counsel under

the advocate-witness rule are assessed differently" depending on which scenario applies.

*Rizzuto*, 2019 WL 1433067, at *3; *see also Nimkoff Rosenfeld & Schechter, LLP v. RKO Props.*,

No. 07-CV-7983, 2014 WL 1201905, at *7 (S.D.N.Y. Mar. 24, 2014) (recognizing distinct

standards), *objection denied*, 2016 WL 3042733 (S.D.N.Y. May 24, 2016); *Lipin v. Bergquist*,

574 F. Supp. 2d 423, 427 (S.D.N.Y. 2008) (same).[12]  In the former scenario, where a lawyer

---

[12] As courts have discussed, this distinction can be traced to Disciplinary Rule 5-102, the
predecessor to Rule 3.7 under New York's Disciplinary Rules, which provided that:

(A)    If, after undertaking employment in contemplated or pending litigation, a
lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a

would be called to testify on behalf of his client, disqualification is warranted if the lawyer's testimony would be "significantly useful" to the client's case. *Lamborn*, 873 F.2d at 531; *see also Lipin*, 574 F. Supp. 2d at 427; *Nimkoff*, 2014 WL 1201905, at *7; *Sea Trade Maritime Corp.*, 2011 WL 3251500, at *8. In the latter scenario, where a lawyer would be called to testify on behalf of a party other than his client, disqualification is warranted if the lawyer's testimony

---

witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial. . . .

(B)    If, after undertaking employment in contemplated or pending litigation, a lawyer learns that or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

*See, e.g.*, *Rizzuto*, 2019 WL 1433067, at *3–4 (quoting D.R. 5-102(A)–(b)). The Second Circuit concluded that "[t]he test under subdivision (A) is whether the attorney's testimony could be significantly useful to his client[,]" and, "[i]f so, he should be disqualified regardless of whether he will actually be called." *Lamborn*, 873 F.2d at 531. Subdivision (B), the court explained, "comes into play where a lawyer's testimony would contradict or undermine his client's factual assertions." *Id.* Courts held that a party bringing a disqualification motion under this subdivision "carrie[d] the burden to show both the necessity of the testimony and the substantial likelihood of prejudice." *Nimkoff*, 2014 WL 1201905, at *7 (gathering cases). The Second Circuit further noted that because motions under subdivision (B) were especially subject to tactical abuse, the moving party "[bore] the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring is substantial." *Lamborn*, 873 F.2d at 531 (citation omitted).

After New York revised Disciplinary Rule 5-102 as part of the 2009 Rules of Professional Conduct, the new version—Rule 3.7—"[did] not distinguish between which side calls the lawyer as a witness." *Rizzuto*, 2019 WL 1433067, at *4 n.2 (discussing the revision and courts' subsequent treatment of Rule 3.7). Since then, some district courts, "seemingly overlooking the distinction between which party should or is likely to call the attorney as a witness, have discussed only whether the attorney's testimony is 'necessary,'" while other courts have continued to recognize the "significantly useful" test in cases where the attorney would be testifying on behalf of his client, *id.* (gathering cases of both types). However, the Second Circuit has observed in dicta that Rule 3.7(a) is "substantially the same" as Disciplinary Rule 5-102(A), *see Ramchair v. Conway*, 601 F.3d 66, 74 n.6 (2d Cir. 2010), and, as stated, some courts have continued to recognize the "significantly useful" standard, *see, e.g.*, *Sea Trade Mar. Corp.*, 2011 WL 3251500, at *10 & n.6.

However, the Court need not decide which standard applies in this case, as Defendants' argument is premature and they have failed to explain who might call Sussman as a witness.

is both (1) "necessary" to the movant's case and (2) "substantially likely to be prejudicial" to the advocate-witness's client.  *See Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 232 (S.D.N.Y. 2010) (citation omitted); *see also John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 126 F. Supp. 3d 413, 420–21 (S.D.N.Y. 2015); *Capponi*, 772 F. Supp. 2d at 472.

Here, Defendants make no effort to identify who might call Sussman as a witness or to explain why his testimony would be either "significantly useful" (if he were to be called by Plaintiff) or "necessary" and "prejudicial" (if he were to be called by Defendant).  (*See* Defs.' Mem. 7.)  The Court will not seek to divine Defendants' theory.  Moreover, even if Defendants had offered a coherent argument—as opposed to a single, perfunctory paragraph—such an argument would be premature in this case.  Where, "as here, it is not clear, prior to the completion of discovery, whether the moving party sustained its burden of showing that the attorney would be called as a witness, the motion to disqualify counsel is premature and should be denied."  *Abdullah v. Sheridan Square Press, Inc.*, No. 93-CV-2515, 1995 WL 413171, at *1 (S.D.N.Y. July 12, 1995); *see also Ross v. Blitzer*, No. 09-CV-8666, 2009 WL 4907062, at *3–4 (S.D.N.Y. Dec. 21, 2009) (denying disqualification motion based on the advocate-witness rule because there had been no discovery and thus there was "no record on which to base a determination that disqualification [was] proper"); *Lipin*, 574 F. Supp. 2d at 428 (finding disqualification motion based on the advocate-witness rule premature where "[t]here ha[d] been no discovery in th[e] [case]," and thus, "the content, relevance, and importance of any witness's trial testimony [was] speculative at best").  Defendants' Motion is therefore denied on this basis as well.

III.  Conclusion

For the foregoing reasons, Defendants' Motion is denied.  The Clerk of Court is

respectfully directed to terminate the pending Motion, (Dkt. No. 31).

SO ORDERED.

Dated:   February 25, 2021
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge